## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**SABRINA T.,[1]**

        **Plaintiff,**

    **v.**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

              **Case No. 1:21-cv-28
JUDGE DOUGLAS R. COLE
Magistrate Judge Litkovitz**

## OPINION AND ORDER

The Magistrate Judge's April 18, 2022, Report and Recommendation (R&R) (Doc. 21), advises this Court to affirm the Commissioner of Social Security's (Commissioner) decision denying Plaintiff social security disability benefits. For the reasons below, the Court **OVERRULES** Plaintiff's Objection (Doc. 24), **ADOPTS** the R&R (Doc. 21), and **AFFIRMS** the Commissioner's decision.

## BACKGROUND

Plaintiff believes she is disabled, both physically and mentally, as the Social Security Administration (SSA) defines that term. She applied for social security disability benefits in 2011. (*See* R&R, Doc. 21, #4486). SSA personnel denied her claim. (*Id.*). Plaintiff challenged that decision before an SSA Administrative Law Judge (ALJ) and requested an evidentiary hearing. (*Id.*). On June 30, 2018, Plaintiff and a vocational expert appeared before the ALJ and provided testimony. (*Id.*). The

---

[1] Because of significant privacy concerns, this Court refers to social security claimants only by their first names and last initials. *See* General Order 22-01.

ALJ issued a written decision on May 3, 2013, finding Plaintiff not disabled. (*Id.* at #4486–87). Plaintiff sought review from the SSA Appeals Council, and that body remanded to the ALJ for additional consideration. (*Id.* at #4487). The ALJ held a second hearing, once more eliciting testimony from the Plaintiff and a vocational expert. (*Id.*). On November 19, 2015, the ALJ issued a second written decision, again finding Plaintiff not disabled. (*Id.*). This time, the Appeals Council denied review. (*Id.*). That made the decision final.

Plaintiff appealed to this Court. The Court ultimately remanded the matter to the ALJ with instructions to (1) "re-weigh the medical opinion evidence"; (2) "reassess [P]laintiff's residual functional capacity, giving appropriate weight to the opinion of Dr. Barnett, including an explanation on the record for the weight afforded to her opinion"; (3) "reassess whether [P]laintiff's mental impairments satisfy Listing 12.04"; and (4) obtain "further medical and vocational evidence as warranted." (*Id.*).

On December 6, 2019, a new ALJ held a third hearing. (*Id.*). Plaintiff and a vocational expert testified. (*Id.*). On January 3, 2020, the ALJ issued a decision once more finding Plaintiff not disabled. (*Id.* at #4487–88). The Appeals Council denied review, making the ALJ's January 2020 decision the new final decision of the Commissioner. (*Id.* at #4488).

In that decision, the ALJ first concluded Plaintiff met the insured status requirements and had not engaged in substantial gainful activity since her alleged onset date. (Tr. 1668, Doc. 7-11, #1728). Next, the ALJ found Plaintiff had the following severe impairments:

2

> rheumatoid arthritis; bilateral carpal tunnel syndrome; degenerative joint disease of the bilateral knees; degenerative disc disease of the lumbar spine; obstructive sleep apnea; asthma; chronic pain syndrome; hypertension; obesity (although [Plaintiff] is no longer currently obese); a depressive disorder; and a personality disorder.

(*Id.*). From this list, the ALJ determined at Step Three that "[Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1[.]" (Tr. 1669, Doc. 7-11, #1729). In relevant part, the ALJ found Plaintiff did not meet Listing 12.04 because she did not have marked limitations in social functioning or in maintaining concentration, persistence, or pace. (Tr. 1682, Doc. 7-11, #1742).

The ALJ next weighed the available medical evidence to determine Plaintiff's residual functional capacity (RFC). Relevant to this Opinion, the ALJ considered the opinions of VA hospital psychiatrist Jalynn Barnett M.D., who treated Plaintiff from 2012 through 2019 with an 18-month gap in treatment around 2015 to 2017. (Tr. 1677–81, Doc. 7-11, #1739–41). Barnett concluded that Plaintiff's mental limitations meant she was likely to miss at least four days of work per month, not meet competitive standards, not interact properly with others, and experience significant limitations in concentration, persistence, or pace, along with experience other extreme, marked, or moderately severe difficulties. (*Id.*). Barnett also repeatedly assigned Plaintiff with Global Assessment of Functioning (GAF) scores between 40 and 45. (*See, e.g.*, Tr. 1032, Doc. 7-8, #1089; Tr. 1415, Doc. 7-10, #1474). As discussed below, however, the ALJ ultimately afforded Barnett's opinions little weight. (Tr. 1683, Doc. 7-11, #1745).

3

Separately, the ALJ considered the views of George Lester, Psy.D., who examined Plaintiff in September 2011. (Tr. 1685, Doc. 7-11, #1745). Lester concluded that Plaintiff suffered mood disorder, personality disorder and certain anti-social and paranoid features. (Tr. 542–49, Doc. 7-7, #598–605). He assigned Plaintiff a GAF score of 50. (Tr. 548, Doc. 7-7, #604). The ALJ afforded Lester's opinion "some weight," but also found it "somewhat vague" and lacking "specific indications of any work-related functional limitations" beyond Plaintiff's self-reported symptoms. (Tr. 1685, Doc. 7-11, #1745).

Based on those findings and others, the ALJ determined that Plaintiff has the RFC to perform light work with certain restrictions. (Tr. 1671, Doc. 7-11, #1731). The ALJ found Plaintiff could not perform her past relevant work. (Tr. 1687, Doc. 7-11, #1747). But after combining her RFC with her age, education, and past work experience, the ALJ determined Plaintiff could perform jobs that exist in significant numbers in the national economy. (Tr. 1688, Doc. 7-11, #1748). As a result, the ALJ found Plaintiff not disabled. (Tr. 1689, Doc. 7-11, #1749).

After the Appeals Council denied review of the ALJ's decision, Plaintiff appealed again to this Court. In her appeal, Plaintiff raised two challenges. First, that the ALJ improperly weighed Barnett's medical opinion testimony. (Statement of Specific Errors, Doc. 11, #4351). And second, that the ALJ erred at Step Three when finding Plaintiff did not meet Listing 12.04. (*Id.* at #4355).

After considering Plaintiff's arguments, the Magistrate Judge issued an R&R advising the Court to affirm the Commissioner's decision (the ALJ's January 2020

decision). (Doc. 21, #4515). The R&R concluded that the ALJ did not commit procedural error and that substantial evidence supported the ALJ's conclusions regarding Barnett's opinions. (*Id.* at #4501–11). The R&R also concluded the ALJ did not err at Step Three. (*Id.* at #4511–15). The Magistrate gave the parties 14 days to lodge specific objections to the R&R (later extended by 21 days). (*Id.* at #4515).

Plaintiff timely objected. (Doc. 24). Plaintiff repeated that the ALJ erred in evaluating Barnett's opinions—both in denying her controlling weight and in failing to give good reasons to afford her little weight. (*Id.* at #4521–26). Plaintiff also argued the ALJ erred in finding Plaintiff did not qualify for Listing 12.04. (*Id.* at #4526).

The matter is now ripe.

## LEGAL STANDARD

If a party objects within the allotted time to a report and recommendation, the court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b). Upon review, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

But that is not the only relevant standard of review. Here, the Magistrate Judge reviewed a decision by an SSA ALJ that the Commissioner adopted. In that setting, courts are "limited to determining whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (quoting

5

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ealy*, 594 F.3d at 512. So long as substantial evidence supports the Commissioner's conclusion, the court should affirm, even if substantial evidence in the record would also support a different conclusion. *Id.* But even if substantial evidence supports the ALJ's decision, the court cannot affirm if "the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

Putting all that together, when a party specifically objects, this Court reviews de novo the objected to portions of the R&R to assess whether (1) the Magistrate Judge correctly determined that the ALJ's decision applied the correct legal standards (including the SSA's own regulations), and (2) substantial evidence supported the ALJ's decision.

## LAW AND ANALYSIS

For purposes of Social Security disability benefits, a disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). By regulation,

the SSA developed a five-step analysis to tell whether an individual is disabled. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). As relevant here, to be considered disabled a claimant may not be gainfully employed and must have one or more severe, medically determinable physical or mental impairments. *See id.* The SSA considers some impairments, listed in a regulatory appendix, to be so severe they automatically entitle a claimant to benefits. *See id.* As discussed more below, an ALJ's determination of whether a claimant meets a listed condition is often called Step Three.

If the claimant's impairment or its equivalent is not on the list, the SSA then considers whether the claimant can still work. *See id.* That is, the SSA assesses the claimant's RFC, often relying on medical and vocational experts to assist in that determination. *See id.* Then, based on the claimant's RFC, age, education, and work experience, the SSA asks whether the claimant can either continue performing the work they had done before, or perform some other job or jobs that exist in significant numbers in the national economy. *See id.* If the claimant falls into either bucket, the SSA will find the claimant not disabled. *See id.* Otherwise, the claimant is disabled. *See id.*

In this appeal, Plaintiff challenges (1) the weight the ALJ gave to Barnett's opinions and (2) the ALJ's refusal to consider Plaintiff disabled at Step Three under Listing 12.04's B Criteria. For the reasons discussed below, the Court finds in the Commissioner's favor on both grounds.

**A.** **The ALJ Did Not Commit Reversible Error In The Weight Given To Dr. Barnett.**

Before starting, a word about which version of the relevant rules apply. In March 2017, the SSA updated its rules on the weight afforded treating physicians. *See* 20 C.F.R. § 404.1520c. But the new rule instructs that "[f]or claims filed before March 27, 2017, the rules in § 404.1527 apply." *Id.* So the Court applies § 404.1527—with the caveat that this analysis would look different if Plaintiff had filed today.

All agree Barnett qualifies as Plaintiff's treating physician. And when evaluating a treating physician's medical opinion, an ALJ gives that opinion "controlling weight" if (1) medically acceptable data and techniques support that opinion, and (2) the ALJ finds the opinion not inconsistent with other substantial evidence in the record. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If an ALJ finds that a treating physician's opinion should receive less than controlling weight, the ALJ must give "good reasons" why, again by reference to the two factors above. *See* 20 C.F.R. § 404.1527(c)(2). And the ALJ must also determine, once again based on "good reasons" (although the permissible "good reasons" at this step are more inclusive), how much weight to assign that opinion. 20 C.F.R. § 404.1527(c)(2). Appropriate factors for the latter analysis include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

In assessing the ALJ's treatment of Barnett, the Court starts by outlining the substance of Barnett's opinions. She provided five relevant questionnaires that make up her opinions concerning Plaintiff's mental impairments. But before discussing those questionnaires, some background helps. In 2012—before Barnett completed any relevant questionnaire—Barnett reported Plaintiff was "extremely overwhelmed by psychosocial stressors," including dealing with her various family members' medical issues, a recent home invasion, and a fire. (Tr. 972, Doc. 7-8, #1029). She also reported a "run-in" with her ex-significant other, about whom, Plaintiff alluded, she had "violent fantasies." (*Id.*). But she "vehemently denying any active intent" to follow through on those fantasies. (*Id.*). Thus, from early in their treatment relationship, Plaintiff represented that situational stressors, at least in part, triggered her mental struggles.

In 2013, Barnett completed an opinion questionnaire detailing Plaintiff's mental issues. Barnett explained that Plaintiff suffered "extreme mood lability, low threshold for tearfulness, poor coping/rocking to self-sooth, homicidal fantasies (recommended admission), depressed/anxious mood, irritability, impaired concentration." (Tr. 1032, Doc. 7-8, #1089). Based on this, Barnett reported Plaintiff could not meet competitive standards to: maintain regular attendance, make simple work-related decision, accept instruction and respond appropriately to criticism from supervisors and get along with co-workers or peers without unduly distracting them. (Tr. 1034, Doc. 7-8, #1091).

In 2015, Barnett reported Plaintiff showed signs of "irritable/anxious affect with minimal range, excessive psychomotor agitation, hopelessness/futility with passive suicidal ideation and occasional homicidal ideation, some paranoid trends, limited insight/judgment." (Tr. 1415, Doc. 7-10, #1474). She continued "patient suffers from intrinsically low frustration tolerance and high baseline level of irritability. This has made her family and personal life more tumultuous and has made it more difficulty to maintain appropriate interpersonal dynamics in work situations. More recently her depression symptoms have had more of a cognitive impact with consistent concentration and short-term memory deficits." (Tr. 1419, Doc. 7-10, #1478).

In 2017, Barnett recorded a guarded, frustrated, and hopeless temperament, mood lability, suicidal ideation, and poor insight and judgment. (Tr. 2467, Doc. 7-17, #2433). She concluded "[t]he patient has fogginess and concentration deficits from her underlying depression that worsens upon being 'flustered' from deadlines/multiple tasks pending. A high baseline level of anxious ruminations also contributes to impaired memory recording and process. She has multiple conditions that lead to a high symptom burden of pain and this constantly affects her level of depression, leading to low frustration tolerance." (Tr. 2471, Doc. 7-17, #2537).

In 2018, Barnett detected "intermittent paucity of speech, slowness to respond, some labile mood with heightened frustrations, history of homicidal ideation/violent fantasies that frightened her." (Tr. 3399, Doc. 7-19, #3467). She continued Plaintiff would be unable to meet competitive standards in interacting appropriately with the

general public due to a lowered frustration tolerance and intermittent mood lability. (Tr. 3401, Doc. 7-19, #3470).

Finally, in 2019, Barnett observed significant weight loss, frustrated affect, history of paucity of speech, history of expressed hopelessness and anger, including homicidal thoughts and irritability. (Tr. 4041, Doc. 7-21, #4111). There, Barnett reported Plaintiff had persistent fatigue and a "high baseline level of pain with intermittent exacerbations that can be distracting and definitely impair her ability to be consistent with schedules and task completion." (Tr. 4044, Doc. 7-21, #4114).

Throughout the treatment relationship, though, Barnett's treatment notes do not always track with the more severe opinions she expressed in the questionnaires. For example, Barnett's 2013 notes describe Plaintiff's mental troubles as originating from her response to situational outside stressors, rather than issues intrinsic to Plaintiff herself. (*See* Tr. 940–41, Doc. 7-8, #997–98). Indeed, Barnett's records depict improvements as those stressors alleviated. (*See* Tr. 1333, Doc. 7-9, #1391). And in 2015, Barnett's records tell that Plaintiff exhibited less hesitancy to speak, only mild irritability and frustration, less labile mood, and lessening hopeless feelings. (*See* Tr. 1475, Doc. 7-10, #1534; Tr. 2653, Doc. 7-17, #2719). In fact, Barnett at one point notes she recommended Plaintiff may be able to slightly *decrease* her frequency of mental health treatment. (Tr. 2653, Doc. 7-17, #2719).

In 2017, Barnett's notes again suggest Plaintiff exhibits much less hesitancy to speak, only moderate frustration, less labile mood, congruent affect, some moments of paucity of speech, and normal through processes. (Tr. 3259, Doc. 7-19, #3327). And

11

once again, Barnett suggested that Plaintiff's troubles originate from situational stressors. (*See* Tr. 3258–59, Doc. 7-19, #3326–27). Barnett described Plaintiff as only "return[ing] to treatment following more dysfunction in her family." (*See* Tr. 3441, Doc. 7-19, #3509).

Barnett's more recent notes followed a similar pattern. In 2018, she reported Plaintiff had no more hesitancy to speak, only moderate frustration, less labile mood, congruent affect, no moments of paucity of speech, and normal through process. (Tr. 3442, Doc. 7-19, #3510). And most recently in 2019, Barnett reported Plaintiff had no hesitancy to speak, only moderate frustration, a less labile mood, congruent affect, no paucity of speech, and a normal thought process. (*See* Tr. 3911, Doc. 7-21, #3981). Indeed, a 2019 report observed Plaintiff's mood as being at "baseline with depressive symptoms that are exacerbated intermittently with psychosocial stressors." (Tr. 4082, Doc. 7-22, #4153). In short, Barnett's clinical observations tend to show Plaintiff's mental challenges were less extreme than Barnett's opinions may suggest.

And indeed, other medical professionals also had a sunnier outlook regarding Plaintiff's mental health. One professional in 2012 described Plaintiff as feeling "on top of" her stress, staying positive by going out with her friends, and exhibiting a "euphoric and bright" mood during the appointment. (Tr. 958–59, Doc. 7-8, #1015–16). And an August 2019 depression screening returned a "negative screen" with no active symptomologies in the prior two weeks. (Tr. 4096, Doc. 7-22, #4167).

After carefully evaluating Barnett's and others' observations and comparing those observations to Barnett's opinions, the ALJ's January 2020 decision declined to give the opinions controlling weight and instead afforded them little weight:

> In this case, I find Dr. Barnett's opinions do not deserve controlling weight, or even some weight, because among other things, they are not consistent with her own treatment notes or the other evidence of record. Instead, I give the opinions little weight because they are not consistent with or supported by the evidence of record, including her own treatment notes, as detailed above. For instance, in her first opinion Dr. Barnett described homicidal fantasies, but her progress notes confirm that [Plaintiff] was merely expressing anger towards her ex-spouse. *See* Exhibit 17F/p63-64. [Plaintiff] acknowledged that she would never act on her thought. *Id.* Moreover, after this isolated incident, the record contains no other ongoing allegations from [Plaintiff] regarding homicidal or suicidal ideations. Yet, in all subsequent opinions, Dr. Barnett continued to note such ideations/fantasies, despite failing to document any ongoing issues in her underlying treatment records.
>
> Likewise, Dr. Barnett's opinions refer to excessive psychomotor agitation, limited insight/judgment, a labile mood, and poor frustration tolerance. Conversely, a review of her progress notes make no mention of ongoing psychomotor agitation. Furthermore, as discussed more fully above, Dr. Barnett regularly documented normal judgment and insight. Dr. Barnett also routinely noted normal thought content, a less labile or no labile mood, no paucity of speech, and only moderate levels of frustration. In Dr. Barnett's April 2015 opinion, she portrayed significant symptomology and nominal functional abilities, but when contacted by Dr. Barnett during this time, [Plaintiff] denied any imminent issues. See Exhibit 26F/p110. In fact, she failed to show for her next scheduled appointment with Dr. Barnett. *Id.*
>
> In that regard, in her third opinion in April of 2017, Dr. Barnett indicated that [Plaintiff] had experienced three episodes of decompensation in the previous twelve months. *See* Exhibit 32F/p4. Yet, when she penned her assessment, she had only recently started treating [Plaintiff] again after nearly nineteen months. There is no reasonable explanation for such an opinion unless Dr. Barnett is relying entirely on the [Plaintiff]'s subjective complaints, which were shown unsupported by the record, as discussed above.
>
> Also, Dr. Barnett's progress notes confirm that [Plaintiff] sought only intermittent treatment, she did not pursue counseling, and that she did

13

not take any anti-depressants at times. *See* Exhibit 62F/p28. [Plaintiff] also testified that she has never been psychiatrically hospitalized. Based on my review of the record, Dr. Barnett has seen [Plaintiff] just seven times since September of 2015. That averages to less than two visits per year. In the absence of consistent care, it is reasonable to question the objective reliability of Dr. Barnett's opinions. Nonetheless, I do note that [Plaintiff] at least has a longitudinal history with Dr. Barnett, as she started treatment with her in 2011. However, if [Plaintiff]'s symptoms and limitations were as severe as alleged, I would expect to see more frequent treatment and ongoing use of anti-depressant, or other medication, neither of which is documented. Again, when given the opportunity to comment on these gaps in treatment at the hearing, [Plaintiff] instead denied any gaps in treatment. [Plaintiff] also indicated that there is "no reason" why she has not seen a counselor or therapist. Thus, while all of Dr. Barnett's opinions were fully considered, I find they garner little weight because overall they are inconsistent with [Plaintiff]'s infrequent, routine, and conservative treatment history. Additionally, Dr. Barnett's own treatment records do not support the severe limitations listed in the opinions.

(Tr. 1686–87, Doc. 7-11, #1746–47).

Plaintiff argues the ALJ committed two errors related to Barnett's opinions. First, Plaintiff says the ALJ improperly refused to afford Barnett controlling weight. Second Plaintiff says the ALJ failed to give good reasons to afford Barnett little weight.

The Court cannot say the ALJ erred.[2] To start, the ALJ did not err in declining Barnett's opinions controlling weight based on the inconsistencies between those opinions and substantial evidence in the record evidence. (*Id.*); *see also Gayheart*, 710

---

[2] Granted, this Court has previously cast doubt on an ALJ's ability to discount a physician's opinion based on the apparent influence of "situational stressors" without other medical opinion testimony supporting that view. *See, e.g.*, *Whitfield v. Comm'r of Soc. Sec.*, No. 3:18-cv-108, 2019 WL 4305823, at *7 (S.D. Ohio Sept. 11, 2019), *report and recommendation adopted*, 2019 WL 4738236 (Sept. 27, 2019). But that is irrelevant here for two reasons. First, Plaintiff did not lodge an objection along those lines. And second, the ALJ also relied on other substantial evidence of inconsistencies sufficient for the Court to affirm the ALJ here.

F.3d at 376. Notably, Barnett's own notes tell a story different from her opinions. "ALJs may discount treating-physician opinions that are inconsistent with substantial evidence in the record, like the physician's own treatment notes."[3] *Leeman v. Comm'r of Soc. Sec.*, 449 F. App'x 496, 497–98 (6th Cir. 2011). And beyond that, Barnett's opinions contradict Plaintiff's otherwise conservative treatment history.

First, Barnett suggested Plaintiff exhibited excessive psychomotor agitation.[4] (*See, e.g.*, Tr. 1686, Doc. 7-11, #1746). At the same time, Barnett's observations do not include clinical observations to support that conclusion, and Barnett never explains from where this opinion originated. (*Id.*). Thus, as the ALJ found, Barnett's opinions lacked a proper basis to articulate any opinion concerning psychomotor agitation.

Second, in 2015, 2017, 2018, and 2019, Barnett *repeatedly* recorded Plaintiff exhibiting (1) much less or *no* hesitancy to speak, (2) mild to moderate frustration, (3) less or *no* mood lability, (4) congruent affect, (5) fewer moments of or *no* paucity of

---

[3] The Sixth Circuit has at times seemingly cast doubt on whether inconsistencies between a treating physician's own clinical observations and their opinions warrant denying an expert controlling weight. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). But following *Gayheart*, the circuit has routinely permitted ALJs to discount treating physician opinions based on inconsistencies between their notes and opinions. *See, e.g.*, *Counts v. Comm'r of Soc. Sec.*, No. 22-3271, 2022 WL 17853572, at *2 (6th Cir. 2022); *Mueller v. Comm'r of Soc. Sec.*, 683 F. App'x 365, 366 (6th Cir. 2017); *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015). And once again, Plaintiff lodged no objection to that specific determination, thereby waiving any argument along those lines.

[4] "Psychomotor agitation refers to a state of restlessness and anxiety that leads to unintentional, repetitive movements. … The excessive motor activity causes the individual to engage in characteristic activities, such as pacing, fidgeting, hand wringing, and pulling at their clothes." Lily Guo, *Psychomotor Agitation*, Osmosis from Elsevier (last visited July 27, 2023), https://www.osmosis.org/answers/psychomotor-agitation#:~:text=The%20 Diagnostic%20and%20Statistical%20Manual,the%20individual%20to%20engage%20in.

speech, and (6) a generally normal thought process. (Tr. 2653, Doc. 7-17, #2719; Tr. 3259, Doc. 7-19, #3327; Tr. 3442, Doc. 7-19, #3510; Tr. 4129, Doc. 7-22, #4200). These repeated clinical observations cut against Barnett's more extreme opinions, and the ALJ underscored these anomalies when discounting her conclusions. (Tr. 1681, Doc. 7-11, #1741; Tr. 1686–87, Doc. 7-11, #1746–47).

Third, other evidence contradicts Barnett's assessments. In 2012, another medical professional reported Plaintiff felt "on top of" her stress and capable of staying positive. (Tr. 1679, Doc. 7-11, #1739). And Plaintiff exhibited a "euphoric and bright" mood during that appointment. (*Id.*). Further, a 2019 depression screening reported Plaintiff's mood at "baseline," with her depression only being "exacerbated intermittently" by situational stressors. (Tr. 4082, Doc. 7-22, #4153).

Finally, the ALJ struggled to square Barnett's severe opinions alongside Plaintiff's comparatively conservative and infrequent treatment regime, along with her decision to voluntarily cease taking her medication. (Tr. 1687, Doc. 7-11, #1747). The ALJ summarized "if the [Plaintiff's] symptoms and limitations were as severe as alleged, I would expect to see more frequent treatment and ongoing use of anti-depressant, or other medication[s], neither of which is documented." (*Id.*). "ALJs [may] properly discounted the opinions of treating physicians where the opinions [are] incompatible with the claimant's generally conservative course of treatment or activities of daily living." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 417 (6th Cir. 2020). In sum, the ALJ relied on substantial evidence when finding that Barnett's opinions inconsistent with other evidence in the record.

16

Plaintiff objects, pointing to the ways Barnett's opinions adhere to her observations. (Doc. 24, #4523–24). Plaintiff also discusses Lester's 2011 clinical observations, which Plaintiff says track with Barnett's findings. (*Id.* at #4524–25). But this at most shows some ways in which Barnett's opinions are *consistent* with various evidence in the record—Plaintiff does little to refute the many *inconsistencies*. "The fact that there is some evidence in the medical records to support [the treating physician's] conclusion is not enough to overturn the agency." *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 440 (6th Cir. 2017). The ALJ did not err in denying Barnett's opinions controlling weight.

The ALJ's analysis of the various "good reasons" to afford the opinion little weight follows largely the same path. To start, the aforementioned inconsistencies constitute good reasons to reduce the weight afforded a treating physician's opinions. *Blakley*, 581 F.3d at 406. But more than that, the ALJ also noted the weak basis for some of Barnett's conclusions. For example, the ALJ found Barnett's 2017 opinion lacked an objective basis for finding Plaintiff suffered three recent decompensation episodes in the prior twelve months because Barnett had not seen Plaintiff in nineteen months. (Tr. 1687, Doc. 7-11, #1747). So Barnett's conclusion must have been based on Plaintiff's own self-reporting. "A doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence and is not entitled to the protections of the good reasons rule." *Mitchell v. Comm'r of Soc. Sec.*, 330 F. App'x 563, 569 (6th Cir. 2009).

True, Barnett and Plaintiff shared a seven-year treatment history, which normally would tend to support Barnett's conclusions. And indeed, the ALJ acknowledged this longitudinal relationship. (Tr. 1687, Doc. 7-11, #1747). But in those years, the two only met infrequently—a fact the ALJ did not miss. (*Id.*). In fact, Plaintiff at one point stopped meeting with Barnett for 18 months. An infrequent treatment record can be another good reason to discount a treating physician's opinion. *Blakley*, 581 F.3d at 406. Thus, the ALJ provided sufficient goods reasons for the decisions: (1) not to afford Barnett's opinions controlling weight, and (2) instead to afford those opinions little weight.

## B. The ALJ Did Not Err In Finding Plaintiff Does Not Qualify Under Listing 12.04.

As discussed above, the SSA maintains a list of conditions automatically "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a). At Step Three, the claimant bears the burden to demonstrate their impairments meet or medically equal the criteria of an impairment on that list. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). Once the claimant has raised a credible argument, the ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).

But to challenge an ALJ's finding, "[a] claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*,

579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

Listing 12.04 establishes criteria for depressive, bipolar, and related disorders.[5] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.04. Plaintiff's objection here focuses on ALJ's decision with regard to the "B Criteria." (Doc. 21, #4513). To qualify under that subsection, "the mental impairments must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of an extended duration." *Primmer v. Comm'r of Soc. Sec.*, No. 2:14-cv-2245, 2015 WL 9474691, at *3 (S.D. Ohio Dec. 29, 2015). "A marked limitation means more than moderate but less than extreme." *Id.*

At Step Three, the ALJ determined that Plaintiff's combined mental impairments did not singly or in combination meet or medically equal the criteria listed in 12.04(B). (Tr. 1670, Doc. 7-11, #1730). The ALJ considered this listing in his January 2020 decision:

> I have considered the [Plaintiff's] mental impairments singly and in combination, but find they do not meet or medically equal the criteria of any listings, including 12.04 or 12.08.
>
> …

---

[5] This Listing has since been revised, but Court applies the law as it was at the time Plaintiff first filed for benefits. *See* Soc. Sec. Admin., *Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138–01, 2016 WL 5341732 (Sept. 26, 2016) (effective Jan. 17, 2017).

In terms of functional limitations, the [Plaintiff's] impairments cause mild restriction in understanding, remembering, or applying information, moderate limitation in interacting with others, moderate difficulties in maintaining concentration, persistence, or pace, and moderate limitation adapting or managing oneself. These functional limitations are supported by the objective medical evidence of record and are discussed in greater detail below. Because the [Plaintiff's] mental impairments do not cause at least one extreme limitation or two marked limitations, the paragraph B criteria are not satisfied.

…

I find the [Plaintiff] is moderately restricted in social functioning. During the pertinent period of this decision, the [Plaintiff's] social interactions appear free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. Again, any anger issues portrayed in the record were transient and related to situational stress. The [Plaintiff] alleged that she has no friends, but said this has always been the case. See Exhibit 4F/p7. On the other hand, the [Plaintiff] maintains regular contact with family. Also, in her function report, the [Plaintiff] denied any issues getting along with others during prior employment. See Exhibit 25E/p7. Likewise, the [Plaintiff] interacted well with her clinicians, who generally noted that the [Plaintiff] was pleasant and cooperative. Still, I limited the [Plaintiff] to no work around the public and only occasional interaction with supervisors and co-workers. Within these restrictions, the [Plaintiff] would never perform joint tasks, mediate disputes, persuade others, handle conflict resolution, or be subject to over-the-shoulder supervision. These significant restrictions accommodate the [Plaintiff's] subjective complaints of social difficulties, despite the lack of objective evidence to support significant difficulties.

Additionally, the [Plaintiff] is only moderately restricted in her ability to maintain concentration, persistence, and pace. Aside from Dr. Barnett's opinions, there is no objective evidence of significant deficits in this domain. There is no evidence of prescribed medication needed to improve concentration. The [Plaintiff] displayed no abnormal speech or thought processes consistent with disabling distractibility. She also demonstrated an ability maintain conversational exchanges with various examiners. It bears repeating that the [Plaintiff] retained custody of her young nieces and nephews, and she reported being involved in her children's physical and mental health appointments. While such activities are not necessarily definitive evidence of no

abnormalities in this area, maintaining such a schedule does require considerable ability to maintain attention and persist. Nevertheless, I accommodated any deficits by limiting the claimant to simple, routine tasks and simple work related decisions in a low stress environment free of strict production quotas or sustained fast paced. I also included numerous other restrictions that concurrently accommodate any reduced stress tolerance and ensure that the [Plaintiff] is able to maintain concentration, persistence, and pace.

…

Finally, I place little weight on the [GAF] scores contained within the record. GAF scores are necessarily subjective and may contain information on financial or relationship stressors unrelated to an ability to work. Because a GAF score is merely
a snapshot of function and not related to an ability to work, the scores do not establish whether or not the claimant could perform the requirements of simple, unskilled work, and thus offer little probative value.

(Tr. 1670–71, 1682, 1687, Doc. 7-11, #1730–31, 1742, 1747).

Plaintiff argues the ALJ erred with respect to social functioning and ability to maintain concentration, persistence, or pace. (Doc. 24, #4526). Plaintiff bases her argument on her low GAF scores, Lester's opinion, and Barnett's clinical observations, including Plaintiff's "hesitancy to speak, crying spells, anger, homicidal/suicidal ideation, and difficulty concentrating." (*Id.*). Plaintiff claims that the ALJ improperly discounted or ignored these pieces of evidence when finding she only suffered moderate limitations in social functioning and ability to maintain concentration, persistence, or pace. (*Id.*).

The Court is unpersuaded. First, the ALJ had the authority to discount the persuasive value of Plaintiff's GAF scores.

GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning … . A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it

> allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning.

*Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). Notably, "'the Commissioner has declined to endorse the [GAF] score for use in' Social Security benefits programs." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016) (quoting *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 716 (6th Cir. 2013)). And the Sixth Circuit has announced "[w]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place." *Kornecky*, 167 F. App'x at 503; *see also DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) ("[W]e have affirmed denials of disability benefits where applicants had [GAF] scores of 50 or lower."). Rather, the ALJ should consider GAF scores case-by-case. *See Miller*, 811 F.3d at 836.

The ALJ appropriately discounted Lester's and Barnett's GAF scores. GAF scores command persuasive weight only to the extent they reflect otherwise persuasive inputs. *See id.* (discussing how an ALJ may discount the persuasive weight of scores that are inconsistent or lack support). Yet here, Lester's and Barnett's GAF scores appear divergent from relevant clinical observations. As discussed above, Barnett's clinical notes are difficult to square with the low GAF scores she assigned. And as for Lester, the ALJ discounted his score because he observed "no specific indication of any work-related functional limitations," but rather parroted "a recitation of the [Plaintiff's] subjective complaints." (Tr. 1685, Doc. 7-11, #1745). Thus, the ALJ was within his rights to discount the GAF scores as unpersuasive.

Second, and more importantly, the ALJ relied on substantial evidence in determining that Plaintiff suffered only moderate limitations to social functioning and in maintaining concentration, persistence, or pace. As the ALJ noted, the record reveals that Plaintiff maintained social relationships with family, reported no troubles in getting along with others in past employment situations, and adequately interacted with clinical staff during appointments. (Tr. 1682, Doc. 7-11, #1742). These objective observations constituted the necessary substantial evidence for the ALJ to make a moderate limitation finding rather than a marked limitation finding. And the ALJ further highlighted record evidence that Plaintiff could maintain concentration, persistence, or pace through her cogent conversations with medical professionals and ability to effectively managing her nieces and nephews schedules. (*Id.*). These observations too support a moderate limitation finding rather than a marked limitation finding.

Again, Plaintiff responds with evidence she argues support more restrictive limitations on her mental capabilities. But once more, the existence of contrary evidence alone cannot undermine the ALJ's decision so long as the ALJ relied on other substantial evidence in the record. *Shepard*, 705 F. App'x at 440. And here, the ALJ did just that.

## CONCLUSION

For these reasons, the Court **OVERRULES** Plaintiff's Objection (Doc. 24), **ADOPTS** the R&R (Doc. 21), and **AFFIRMS** the Commissioner's decision. The Court

**ORDERS** the Clerk to enter judgment and **TERMINATE** this matter from the Court's docket.

       **SO ORDERED.**

August 10, 2023
**DATE**

       **DOUGLAS R. COLE**
       **UNITED STATES DISTRICT JUDGE**